1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| D.W., a minor, by and through her guardian ad litem JESSICA MARTINEZ, individually and as successor in interest to SERGIO WEICK; L.W. and E.W., minors, by and through their guardian ad litem MAGDALENA LUGO, individually and as successors in interest to SERGIO WEICK; CRUZ WEICK, an individual; STEVEN NEIL WEICK, an individual, | Case No.:  17-cv-1459-WQH-AGS **ORDER** |

                                         Plaintiffs,

v.

COUNTY OF SAN DIEGO, an entity;
PETER MYERS, an individual;
CHRISTOPHER VILLANUEVA, an
individual; et. al.,

                                         Defendants.

HAYES, Judge:

        The matter before the Court is the Motion for Summary Judgment filed by
Defendants Peter Myers, Christopher Villanueva, and County of San Diego.  (ECF No.
30).

//

1

## I. Background

On July 19, 2017, Plaintiffs D.W., L.W., E.W., Cruz Weick, and Steven Weick initiated this action by filing the Complaint. (ECF No. 1). Plaintiffs are the minor children and parents of decedent Sergio Weick. Plaintiffs bring federal claims under 42 U.S.C. § 1983 against Defendants Myers and Villanueva for: (i) excessive force in violation of the Fourth and Fourteenth Amendments; (ii) failure to provide medical care in violation of the Fourth and Fourteenth Amendments; (iii) failure to provide substantive due process in violation of the Fourteenth Amendment; and (iv) failure to supervise, train and take corrective actions.[1] Plaintiffs bring a federal claim against Defendant County of San Diego for (v) *Monell* violations. Plaintiffs bring state claims against all Defendants for (vi) assault and battery and (vii) negligence. *Id.*

On September 28, 2018, Defendants Myers, Villanueva, and County of San Diego filed a Motion for Summary Judgment. (ECF No. 30). On November 27, 2018, Plaintiffs filed Opposition. (ECF No. 37). On December 3, 2018, Defendants filed a Reply. (ECF No. 38). On February 1, 2019, the Court heard oral argument on the Motion.

## II. Facts

On August 11, 2016, Deputies Peter Myers and Christopher Villanueva of the Vista Sheriff's Department were attempting to bring Sergio Weick into custody for a probation violation. (ECF No. 37-1 ¶ 1). Villanueva and Myers, the latter a member of the Vista Sheriff's Department's Gang Enforcement Team, had been informed by other officers that Weick was a member of the Vista Home Boys. (*Id.*; Villanueva Dep., ECF No. 37-6 at 64). The Vista Home Boys are a street gang involved in the distribution of methamphetamine in Vista. (Haddad Dep., ECF No. 30-2 at 107–08; ECF No. 37-1 ¶ 5).

---

[1] The Complaint does not state a constitutional basis for a "failure to train" claim against Deputies Myers and Villanueva. (ECF No. 1 ¶ 78). Plaintiffs do not address the fourth claim in the Opposition. Because the Court finds no underlying Fourth Amendment violation, Plaintiffs' failure to train claim is moot and it is unnecessary to determine if Plaintiffs have waived their fourth claim.

Members of the Vista Home Boys are known to the Vista Sheriff's Department to carry firearms.  (ECF No. 37-1 ¶ 5).

Myers had been informed that Weick sold methamphetamine and that Weick had been seen that week by an informant with a sawed-off shotgun.  (Myers Stmt., ECF No. 30-2 at 25).  Myers was aware that Weick had had "weapons charges before," but did not know specific details about the charges.  (Myers Dep., ECF No. 37-5 at 18).  Myers had been informed that an informant told a detective at the Sheriff's Department that Weick stored the sawed-off shotgun in his vehicle, between his right leg and the center console. (Myers Stmt., ECF No. 30-2 at 25).  Myers had been informed that the informant told the Sheriff's Department that the informant had seen ammunition Weick kept for the shotgun, and that Weick had told the informant "that he wasn't going back to prison."  *Id.*  Myers also was aware that in August of 2014, Weick had been the subject of a Special Enforcement Detail callout.  (ECF No. 37-1 ¶ 5).  In that incident, Weick barricaded himself in a residence with firearms when authorities attempted to execute a search warrant.  *Id.*  A standoff ensued, and authorities on the S.W.A.T. team deployed chemical agents to end the standoff and arrest Weick.  *Id.*

At approximately 12:30 p.m., Myers and Villanueva drove marked patrol cars to an address on Gail Drive in Vista where a black Lexus believed to be owned and driven by Weick was parked.  *Id.* ¶ 2.  Before Myers and Villanueva arrived, a police radio dispatch stated that the Lexus was leaving the Gail Drive address.  *Id.*  Myers pulled over at a nearby intersection.  *Id.*  A black Lexus drove past.  *Id.*  Myers recognized the driver as Weick. *Id.*  Myers began to follow Weick.  *Id.* ¶ 3.  Villanueva, assisting the Gang Enforcement Team as part of his patrol training, pulled his vehicle behind Myers.  *Id.*

Once Weick reached a less densely populated area of Vista, Myers believed it was safe to stop Weick.  Myers turned on his lights and siren and attempted to initiate a traffic stop.  *Id.*; ECF No. 30-2 at 199.  Weick did not stop.  *Id.*  Myers initiated a high-speed chase, following Weick as Weick drove through red lights and reached speeds of fifty to one hundred miles per hour on residential Vista streets.  *Id.*  Myers believed that during the

chase he saw Weick reaching for something in his car.  *Id.*  After driving several miles, Weick turned onto Iron Street and into a cul-de-sac that dead ends at a residential apartment complex.  *Id.* ¶¶ 3–4.  At the end of the road, Weick crashed into a concrete wall.  *Id.*

Weick exited his vehicle on foot.  *Id.* ¶ 6.  In the process of exiting, Weick stumbled and fell to one knee, catching himself with one hand and pushing himself back up.  (Myers Dep., ECF No. 37-5 at 45).  Myers yelled, "Sheriff. Stop."  *Id.* at 46.  Weick turned and ran into the apartment complex.  (ECF No. 37-1 ¶ 6).  Myers exited his vehicle and followed.  *Id.*  Villanueva, arriving moments later, parked and followed behind Myers.  *Id.* ¶ 9.  Weick ran though the apartment complex parking lot and continued onto a sidewalk that rounded the corner of an apartment building.  *Id.* ¶ 6.  Myers temporarily lost sight of Weick.  *Id.*  When Myers reached the corner, he regained sight of Weick.  *Id.*  Myers states:

> [I]t looked like he was running away from me, and then he kind of stumbled and fell to his knees and then was in like a kneeling position. So he had his right knee down and his left—so his like right knee was down. His left knee was up, but he was kind of like sitting back on his heels, and he was looking down like at his waistband.
>
> So I thought it was weird, 'cause we had just qualed [sic] yesterday, and part of our shooting is kneeling, and he was in like a kneeling, shooting position is what I thought.
>
> So he was reaching—looking down, and he had both of his hands on his waistband, and he was like reaching into his waistband and kind of like fumbling with something in his waist.
>
> Q. And where are you—you said he's looking down. Are you behind him at this point?
>
> A. Yeah. So I was—yeah, I was behind him but he had turned around and was kind of bladed towards me. So he was facing, I guess, northwest. I was facing straight east.
>
> Q. Okay.
>
> A. So I could—I could see kind of his right hand, but I couldn't see what his right hand was doing. I could see that he was reaching with his left hand.
>
> . . . .

A. And he was reaching in his waistband and like fumbling with stuff like he was trying to get something out but couldn't get something out of his waistband but couldn't.

Q. Okay.

A. So I thought, based on like knowing how shotguns work, if I were to conceal a shotgun, I'd have it my waistband and it would be kind of a hassle to get it out of my waistband

Q. Uh-huh.

A. So I said, "Show me your hands" or "Put your hands up." I just remember saying "hands," like I yelled I think, "Show me your hands." And he kept fumbling like kept trying to pull, like he was like his whole body was like pulling up on his waistband.

. . . .

Q. Okay. So what happened next?

A. So [Weick] was like reaching. I said, "Show me your hands. Show me your hands. Show me your hands." I think I said that like three or four times, and he wouldn't.

And I just—based on that information—I don't remember shooting, but I remember thinking like, "Hey, this—this is it. He's like trying to get a gun, and we're in a dead-end cul-de-sac apartment."

(Myers Stmt., ECF No. 30-2 at 46–49).  Myers, standing approximately five to ten feet from Weick, fired ten shots at Weick.  (Myers Dep., ECF No. 37-5 at 51–57).

Villanueva, following behind Myers and Weick on foot but without a visual, heard shots and heard Myers' commands to Weick.  (ECF No. 37-1 ¶ 9).  Villanueva reached Myers and Weick.  When Villanueva was approximately three to seven yards from Weick, Villanueva "saw [Weick] reaching for what appear [sic] to be a weapon."  (Villanueva Dep., ECF No. 37-6 at 38).  Villanueva states he saw a "hard metallic object that resembled a handgun" on Weick's waistband.  *Id.* at 90.  Villanueva fired nine shots at Weick.  *Id.* at 44.

5

Weick fell to the ground and was handcuffed by other deputies. (ECF No. 37-1 ¶ 10). Multiple knives were found on Weick's person, including one in a sheath on Weick's left hip. (ECF No. 30-2 at 200; Myers Stmt., 30-2 at 51–52). A sawed-off shotgun was found in Weick's vehicle. (ECF No. 37-1 ¶ 10). Two shotgun shells were found at the scene of the shooting, and several more were found in Weick's pocket. (ECF No. 30-2 at 200). Paramedics were called and arrived at the scene approximately six minutes later. (ECF No. 37-1 ¶ 10). Weick was pronounced dead the following day. (ECF No. 30-2 at 200). The autopsy report indicates that Weick had methamphetamine in his system at the time of the shooting. (ECF No. 37-9 at 11).

## III.   Legal Standard

A party may move for summary judgment, identifying each claim or defense or the part of each claim or defense on which summary judgment is sought. Fed. R. Civ. P. 56(a). A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Id.* A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). If the moving party meets this initial burden, however, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." (citing *Anderson*, 477 U.S. at 242, 252)). Rather, the

nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Such admissions may be presented in testimony of a party's own witnesses through declarations. *See* Fed. R. Civ. Pro. 56(c)(4).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## IV.   Discussion

### a.   Fourth Amendment Claims

#### i.   Contentions

Defendants contend that they are entitled to summary judgment on Plaintiffs' Fourth Amendment excessive force claims because the actions of Myers and Villanueva were objectively reasonable.  (ECF No. 30-1).  Plaintiffs contend that Myers and Villanueva used excessive force when they fired at Weick because "Defendants were never fired on, they never saw a gun pointed at them" and Weick was "visibly unarmed." (ECF No. 37 at 8).  Plaintiffs assert that summary judgment is inappropriate because Weick cannot testify, and "it [is] just as likely that Weick was on his knees, unarmed and surrendering as that he was doing anything that the Defendants claim in their self-serving testimony." *Id.*

#### ii.   Legal Standard

The Fourth Amendment permits law enforcement officers to use force "'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989).  "*Graham* sets out a non-exhaustive list of factors for evaluating [on-the-scene] reasonableness: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape." *Maxwell v. Cty. of San Diego*, 697 F.3d

941, 951 (9th Cir. 2012).  "[T]he 'most important' factor under *Graham* is whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)) *cert. denied*, 134 S. Ct. 2695 (2014).  Yet, "there are no per se rules in the Fourth Amendment excessive force context." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc).  The court "must consider the totality of the circumstances." *Longoria v. Pinal Cty.*, 873 F.3d 699, 705 (9th Cir. 2017).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

### iii.  Ruling of the Court

Myers and Villanueva sought to arrest Weick for a probation violation.  Viewing the facts in the light most favorable to Plaintiffs, the Court concludes that the first factor noted in *Graham*, the severity of the crime at issue, weighs in favor of Plaintiffs.

The third factor cited in *Graham* is whether the suspect was resisting or seeking to evade arrest.  Weick did not stop when Myers attempted to initiate a traffic stop.  Weick engaged in a high-speed chase on residential Vista streets, including through red lights, before crashing his vehicle and attempting to flee on foot.  Myers yelled, "Sheriff Stop," when Weick first exited his vehicle, and yelled, "Show me your hands" or "Put your hands up" before firing his weapon at Weick.  Viewing the facts in the light most favorable to Plaintiffs, the Court finds that the third factor cited in *Graham*, whether the suspect was actively resisting arrest or attempting to evade arrest by flight, weighs in favor of Defendants.

The second and "most important" factor in determining the reasonableness of the use of force is "whether the suspect posed an immediate threat to the safety of the officers

or others." *George,* 736 F.3d at 838 (internal quotation omitted).  At the time Myers chose to fire his weapon, Myers had been informed by another police officer that Weick was a member of the Vista Home Boys.  Myers was aware that Weick had previously been charged with gun-related and controlled substance-related offenses.  Myers had been informed that an informant had told the Sheriff's Department that Weick kept a sawed-off shotgun in his vehicle, and that the informant told the Sheriff's Department that Weick had said that he wasn't going back to prison.  Myers was aware that Weick had previously barricaded himself in a residence with weapons and that a S.W.A.T. team had to use chemical agents to end the standoff.

During the chase, Myers saw Weick appear to be reaching for something in his vehicle.  After Weick crashed his vehicle, Weick disobeyed Myers's command to "stop" and then ran through an apartment complex before stumbling to one knee.  When Weick fell, his body was "bladed" away from Myers, so that Myers could see part of Weick's upper torso, but Myers could not see Weick's hands.  Myers yelled at Weick to stop what he was doing and show his hands.  Myers states that Weick "was pulling up so forcefully on his waistband that his knees were coming off the ground, and he did that several times. So I believed that he was reaching into his waistband to pull out a shotgun to shoot me." (Myers Dep., ECF No. 30-2 at 133).  Villanueva states that he saw Weick pulling up on his waistband on a "hard metallic object that resembled a handgun."  (Villanueva Dep., ECF No. 37-6 at 90).

Myers and Villanueva did not know that Weick did not have a gun on him at the time of the shooting.  Myers and Villanueva reasonably believed that Weick had a sawed-off shotgun or handgun concealed in his pants, held in place by his waistband.  If Weick did have a gun, with the information Myers and Villanueva had about Weick, it would be reasonable for Myers and Villanueva, standing no more than ten and twenty-one feet from Weick, to believe their lives were in immediate danger.  The Court concludes that under

these facts, it was objectively reasonable for Myers and Villanueva to use deadly force.[2] *See Saucier v. Katz*, 533 U.S. 194, 207 (2001) ("Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred."); *George*, 736 F.3d at 838 ("This is not to say that the Fourth Amendment always requires officers to delay their fire until a suspect turns his weapon on them. If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."); *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014) (noting on similar facts that "[i]t would be unquestionably reasonable for police to shoot a suspect in [decedent's] position if he reaches for a gun in his waistband, or even if he reaches there for some other reason. Given [decedent's] dangerous and erratic behavior up to that point, the police would doubtless be justified in responding to such a threatening gesture by opening fire").

Plaintiffs contend that there is an issue of material fact because "Weick died and is not here to testify and the physical evidence (downward angled bullet trajectories) makes it just as likely that Weick was on his knees, unarmed and surrendering as that he was doing anything that the Defendants claim in their self-serving testimony." (ECF No. 37 at 8). There is no testimony in the record directly contravening the testimony of Myers and Villanueva. Critically, however, Weick is unavailable to testify. On a motion for summary judgment, the court must make inferences in favor of the nonmoving party, and the court cannot make credibility determinations properly left for the jury. *See Anderson*, 477 U.S. at 255. At the same time, the nonmoving party cannot defeat summary judgment merely

---

[2] Plaintiffs' use of force expert opines that Defendants "failed to use less intrusive alternatives, such as 1. [c]alling for backup and containment, 2. tactical plan, 3. use of cover and 4. use of less than lethal force that were readily available." (ECF No. 37 at 11). Even if Defendants utilized flawed tactics that led to the confrontation in the apartment complex, that is insufficient to render the force used in this case unreasonable under the Fourth Amendment. *See City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1777 (2015) (noting that plaintiff could not "establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided") (quoting *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002)).

by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. To accommodate both standards, the Ninth Circuit has stated:

> [I]n the deadly force context, we cannot "simply accept what may be a self-serving account by the police officer." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.1994). Because the person most likely to rebut the officers' version of events—the one killed—can't testify, "[t]he judge must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.*; *see also Gonzalez v. City of Anaheim*, 747 F.3d 789, 794–95 (9th Cir.2014) (en banc). This includes "circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Scott*, 39 F.3d at 915.

*Cruz*, 765 F.3d at 1079.

Plaintiffs first assert that evidence in the autopsy report of "various trajectory angles," ECF No. 37 at 11, and "downward angled bullet trajectories," *id.* at 8, is circumstantial evidence that calls into question the veracity of Myers and Villanueva's testimony. Plaintiffs assert that "Defendants incredibly claim that Weick remained in a position on his knees with his hand in his waistband without moving while they fired all 18 shots into him when they were only five feet away and could have kicked Weick onto his back." *Id.* Plaintiffs assert that "[t]he bullet trajectories are at various angles indicating that Weick was moved by the bullets strikes [sic] and yet they continued firing into him." (ECF No. 37 at 15). Plaintiffs cite *Ting v. U.S.* for the proposition that the Court should deny summary judgment because there is a discrepancy between the bullet trajectories and the officers' account of the shooting. In *Ting*, the plaintiff provided a ballistics expert who opined that the bullet wounds "directly contradict[ed] the agents' testimony" that the agent was standing upright when he fired. 927 F.2d 1504, 1510 (9th Cir. 1991); *see also J.L.D. v. City of L.A.*, 555 F. App'x 670, 671 (9th Cir. 2014) (relying on expert testimony to conclude that bullet trajectories contradicted officer's account of shooting and created issue of fact).

In this case, Weick was down on one knee when he was shot, and two deputies fired from different angles. There is no evidence or testimony—expert or otherwise—in the

record that the bullet wounds are inconsistent with two deputies firing from different angles at a man crouched down on one knee trying to pull something out of his waistband.  The Court does not find that the evidence of bullet trajectories discredits the testimony of Myers or Villanueva.

Second, Plaintiffs assert that Villanueva "began firing shots only after 4 to 14 shots had already been fired and he thought (mistakenly) that Weick was firing. Villanueva then changes his story and says that he fired because he thought that Weick was reaching. This makes no sense because Villanueva began firing based on his own account of hearing shots that he thought were fired by Weick (but were really fired by Myers)."  (ECF No. 37 at 17–18).  Villanueva stated in his deposition that he heard shots before he could see Myers and Weick, and believed they were involved in a shootout.  Once Villanueva got a visual, he made the decision to fire after seeing Weick reaching into his waistband.  The Court does not find that there is an inconsistency in Villanueva's testimony that calls into question the veracity of his statement.

Third, Plaintiffs assert that "[w]hen Myers first gave a statement to investigators after the shooting he did not even recall having fired his gun. The Jury could conclude that Myers' later 'recall' in his deposition is fabrication and that Myers' post-shooting statement is correct that Myers fired at Weick without ever assessing any immediate threat and not even recalling that he had fired."  (ECF No. 37 at 9).  Myers' August 11, 2016 statement provides:

> So [Weick] was like reaching. I said, "Show me your hands. Show me your hands. Show me your hands." I think I said that like three or four times, and he wouldn't.
>
> And I just—based on that information—I don't remember shooting, but I remember thinking like, "Hey, this—this is it. He's like trying to get a gun, and we're in a dead-end cul-de-sac apartment."

(Myers Stmt., ECF No. 30-2 at 46–49).  The statement does not indicate that Myers shot Weick "without ever assessing any immediate threat."  The statement indicates that Myers

remembers what he was thinking when Weick attempt to obtain something from his waistband.  The statement above is consistent with the rest of Myers' testimony.

Finally, Plaintiffs compare this case to *Cruz* and assert that "it makes no sense that Weick would be reaching when he is unarmed and it makes no sense that Weick would be on his knees 5-7 feet away from the deputies trying to draw a gun that isn't there." (ECF No. 37 at 17).  Like *Cruz*, the record reflects that Weick did not have a gun on him at the time he was shot.  However, unlike the decedent in *Cruz*, Weick was armed with multiple knives on his person, including one in a sheath on his left hip.  It would be consistent with the testimony of Myers and Villanueva for Weick to have been reaching for the knife sheathed on his left hip.[3]  The shooting also took place in the middle of the day on a sidewalk in an apartment complex.  When Weick, Myers, and Villanueva drove in, they drove past a maintenance worker at the entrance of the apartment complex who was "startled" when Weick "blew like right past the guy." (Myers Stmt., ECF No. 30-2 at 43–44).  There is no evidence in the record that the maintenance worker saw the shooting, but Myers and Villanueva would have had no way of knowing that he or a resident of the complex would not have witnessed it.  If Myers and Villanueva were going to intentionally shoot a visibly unarmed subject who was clearly on his knees surrendering—as Plaintiffs allege—broad daylight in an apartment complex at lunch time would be an exceptionally risky place to do it.

After considering all of the evidence in the record to determine whether Myers and Villanueva's statements are internally consistent and consistent with other known facts, the

---

[3] The autopsy report indicates that Weick had methamphetamine in his system at the time he was shot.  Plaintiffs' toxicology expert Okorie Okarocha disputes the reliability of the drug test and opines that it cannot be determined from the toxicology report if the methamphetamine in Weick's system was the street drug Weick was known to sell or the non-psychoactive variety found in nasal decongestants.  The Court here does not consider this disputed fact as part of its determination of the reasonableness of the Deputies' actions, however, both since it is disputed and because the Deputies were not aware of it. The Court considers it only for the purposes of determining whether other known facts undermine the credibility of the Deputies' testimony.

Court finds that the circumstantial evidence does not "tend to discredit the police officer's story." *See Cruz*, 765 F.3d at 1079. Defendants' are entitled to summary judgment on Plaintiffs' Fourth Amendment claims because it was objectively reasonable for Myers and Villanueva to use deadly force in the circumstances described.[4]

### b. Fourth Amendment Qualified Immunity

As noted above, the Court finds that Myers and Villanueva did not violate the Fourth Amendment when they used deadly force against Weick. Regardless, the Court considers the second prong of the qualified immunity analysis.

### i. Contentions

Defendants contend that even if there was a Fourth Amendment violation, Myers and Villanueva are entitled to qualified immunity. With respect to Myers, Defendants contend that "[a]t the moment of the decision to shoot, Deputy Myers had probable cause to believe that he face [sic] a threat of serious harm and believed he had no choice. Under the circumstances, reasonable officers would perceive a substantial risk that Weick would seriously injure or kill deputies. . . . This is not a case where it is obvious that there was a violation of clearly established law under Garner and Graham." (ECF No. 30-1 at 14). Villanueva arrived at the scene after the shooting had already begun, and Defendants contend that "established federal law does not prohibit a reasonable officer who arrives late to an ongoing police action from assuming that proper procedures have already been followed. No settled Fourth Amendment principle requires that officer to second-guess the

---

[4] The Complaint also alleges a claim for denial of medical care under the Fourth Amendment. Plaintiffs did not raise any arguments in its Opposition with respect to this claim. Regardless of whether Plaintiffs intended to waive this claim, the record reflects that other officers arrived at the scene moments after the shooting and took primary responsibility for caring for Weick. Paramedics arrived at the scene six to seven minutes after the shooting. There is no evidence in the record to support a conclusion that Myers or Villanueva were responsible for an excessive delay in providing Weick with medical care. *See Tatum v. City & Cty. of S.F.*, 441 F.3d 1090, 1099 (9th Cir. 2006) ("[A] police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment[.]").

earlier steps already taken by his or her fellow officers in instances like the one Villanueva confronted here." *Id.*

Plaintiffs contend that Myers and Villanueva are not entitled to qualified immunity because "[t]here is no qualified immunity for shooting a visibly unarmed man as the law had been clearly established that this was unconstitutional excessive force." (ECF No. 37 at 10).

### ii. Legal Standard

Qualified immunity shields government officials from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In determining whether an officer is entitled to qualified immunity, courts consider "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Estate of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017) (quoting *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014)). A plaintiff "bears the burden of showing that the right at issue was clearly established." *Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011) (citing *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002)).

Plaintiffs may not "define clearly established law at a high level of generality." *Sheehan*, 135 S. Ct. at 1776. In this context, "clearly established" means that, "at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Courts must "define the 'clearly established' right at issue on the basis of the 'specific context of the case.'" *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Thus, liability will not attach unless there exists "a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam); *see also Kisela v. Hughes*, 138 S.

Ct. 1148, 1153 (2018) (per curiam) ("[P]olice officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015))).  "In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Pauly*, 137 S. Ct. at 551 (quoting *Mullenix*, 136 S. Ct. at 308).

### iii.  Ruling of the Court

As a threshold matter, when determining whether the right was clearly established at the time of the shooting, the Court may only consider cases of "controlling authority in their jurisdiction at the time of the incident which clearly established the rule on which [plaintiffs] seek to rely" or a "consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful."  *Wilson v. Layne*, 526 U.S. 603, 617 (1999).  Plaintiffs contend that "there are numerous cases demonstrating that the law was clearly established on August 11, 2016 and there is no qualified immunity."  (ECF No. 37 at 23).  Plaintiffs cite *A.K.H by and through Landeros v. City of Tustin*, 837 F.3d 1005 (9th Cir. 2016),  *Estate of Andy Lopez by and through Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017),  *Longoria v. Pinal County*, 873 F.3d 699 (9th Cir. 2017), and *Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017).  All of these cases were decided after August 11, 2016.  These cases were not controlling authority at the time of the shooting.  The Court declines to consider them.

Apart from the cases cited above, Plaintiffs cite to *Garner v. Tennessee* for the general proposition that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead."  471 U.S. 1, 11 (1985).  In light of recent Supreme Court and Ninth Circuit case law directing courts "not to define clearly established law at a high level of generality[,]" Plaintiffs' reliance on *Garner* is insufficient.  *See Mullenix*, 136 S. Ct. at 308 (quoting *al–Kidd*, 563 U.S. at 742); *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017) ("General excessive force principles, as set forth in *Graham* and *Garner*, are not inherently incapable of giving fair and clear warning to officers, but they

do not by themselves create clearly established law outside an obvious case.") (internal quotations omitted).

In this case, Myers and Villanueva pursued an individual on foot who had just engaged them in a high-speed car chase. Myers and Villanueva had been informed that the individual they were pursuing was believed to be a gang member carrying a sawed-off shotgun who previously had been charged with weapons-related offenses, had recently engaged in a standoff with a S.W.A.T. team, and had told an informant he was not going back to prison. Weick had ignored multiple commands to "stop" and "show his hands." Weick was on one knee, forcefully reaching into his waistband for a metallic object that Villanueva believed was a handgun. These facts do not present "an obvious case." *See S.B.*, 864 F.3d at 1015. Plaintiffs cite to no controlling authority decided before August 11, 2016 that would establish "beyond debate" that it was objectively unreasonable for the Deputies to use deadly force under the facts of this case.[5] *See al–Kidd*, 563 U.S. at 741. The Court finds that because the law was not clearly established at the time of the shooting, Myers and Villanueva are entitled to qualified immunity on Plaintiffs' Fourth Amendment

---

[5] Plaintiffs cite *Cruz* in their qualified immunity briefing. (ECF No. 37 at 25). The underlying facts in Cruz are indeed similar to this case. In *Cruz*, an informant told officers that the decedent, Ceasar Cruz, was a gang member who sold methamphetamine and carried a gun in his waistband. 765 F.3d at 1077. Cruz had a prior weapons related-conviction and the informant said that Cruz told him he "was not going back to prison." *Id.* at 1078. When officers tried to initiate a traffic stop, Cruz attempted to flee before eventually getting out of his car and "reach[ing] for the waistband of his pants." *Id.* Cruz did not have a gun in his waistband, but did have one in his vehicle. *Id.* The Ninth Circuit ultimately reversed the district court's summary judgment finding for the defendants because the Ninth Circuit found that circumstantial evidence and inconsistencies in the officers' testimony undermined the credibility of their accounts. *Id.* at 1080. As discussed in the preceding section, however, the Court does not find that the Deputies' accounts in this case are internally inconsistent or that circumstantial evidence in the record creates cause to doubt the veracity of their accounts. Moreover, *Cruz* supports the Court's findings in this case: the *Cruz* court stated that if the officers' testimony was to be believed, "[i]t would be unquestionably reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in his waistband, or even if he reaches there for some other reason. Given Cruz's dangerous and erratic behavior up to that point, the police would doubtless be justified in responding to such a threatening gesture by opening fire." *Id.* at 1078.

excessive force claim, regardless of whether their actions constituted a Fourth Amendment violation.

### c. Substantive Due Process Claim

#### i. Contentions

Defendants contend that there is no substantive due process violation because "both deputies acted without an opportunity to deliberate at all. This event required split-second decisions at the risk of death or serious harm." (ECF No. 30-1 at 15). Defendants assert that there "is neither an underlying constitutional violation nor is there any evidence that deputies acted with a purpose to harm. Rather, they were acting in self-defense." *Id.*

Plaintiffs contend that "deliberation was practical both before and during the use of force" and "[e]ven under a purpose to harm standard to advance on a man who is on his knees, visibly unarmed and then shoot down into him 19 times, killing him is purpose to harm unrelated to any legitimate law enforcement objective and there is no justification for it." (ECF No. 37 at 27–28).

#### ii. Legal Standard

Spouses and children may assert Fourteenth Amendment substantive due process claims if official conduct deprives them of their liberty interest in the companionship and society of their spouse or parent. *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013). "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). "In determining whether excessive force shocks the conscience, the court must first ask whether the circumstances are such that actual deliberation by the officer is practical." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (internal quotations and alterations omitted). If the officer in question was faced with a time frame where actual deliberation was practical, a plaintiff may establish a Fourteenth Amendment violation by showing that the officer "acted with deliberate indifference." *Porter*, 546 F.3d at 1137. "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct

may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives. For example, a purpose to harm might be found where an officer uses force to bully a suspect or 'get even.'" *Wilkinson*, 610 F.3d at 554 (internal citation omitted).

### iii.  Ruling of the Court

Myers and Villanueva fired at Weick in the midst of a foot chase after a high-speed pursuit. Myers and Villanueva saw Weick reaching into his waistband and believed that Weick was about to pull out a weapon and fire it at them. The shooting took place in a matter of seconds. Myers and Villanueva did not have time to deliberate. Application of the purpose-to-harm standard is appropriate. *See Wilkinson*, 610 F.3d at 554. As discussed above, Defendants did not violate the Fourth Amendment when they used deadly force against Weick. Moreover, no evidence in the record suggests that Myers and Villanueva acted with a purpose to harm unrelated to legitimate law enforcement objectives. Summary judgment in favor of Defendants is appropriate on Plaintiffs' substantive due process claim.

### d. *Monell* Claim

#### i.  Contentions

Defendants contend that Plaintiffs' *Monell* claim is meritless because "there is no evidence that this event was caused by lack of training or that there is a pattern of unconstitutional actions by deputies." (ECF No. 30-1 at 18).

Plaintiffs contend that Myers and Villanueva used excessive force and Defendant County of San Diego is liable "based on the facts of failure to discipline, train; showing custom and practice of civil rights violations and the current incident itself." (ECF No. 37 at 29).

#### ii.  Legal Standard

A county can be liable under 42 U.S.C. §1983 only for an official policy or an unofficial custom that causes a constitutional violation. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978). Four conditions must be satisfied in order to establish municipal liability under *Monell*. The plaintiff must show: "(1) that he possessed a

constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996) (quoting *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)).

### iii.  Ruling of the Court

As discussed above, Plaintiffs have failed to establish a constitutional deprivation for either excessive force under the Fourth Amendment or substantive due process under the Fourteenth Amendment.[6]  Consequently, Plaintiffs cannot satisfy the first prong of the *Monell* test since Plaintiffs cannot show that they "possessed a constitutional right of which [they were] deprived."  *See Van Ort*, 92 F.3d at 835; *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("[N]either *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when . . . the officer inflicted no constitutional harm.").  Defendant County of San Diego is entitled to summary judgment on Plaintiffs' *Monell* claim.

### e.  State Battery and Negligence Claims

Plaintiffs bring state battery and negligence claims.  Under California law, a plaintiff bringing a battery claim "must prove unreasonable force as an element of the tort." *Edson v. City of Anaheim*, 74 Cal. Rptr. 2d 614 (Cal. Ct. App. 1998).  California courts use the federal *Graham* standard for determining the reasonableness of the force used.  *Id.*

---

[6] The lack of an underlying constitutional violation also precludes recovery under a *City of Canton v. Harris*, 489 U.S. 378 (1989) "failure to train" theory.  *See Scott*, 39 F.3d 912, 916 (9th Cir. 1994) ("While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights. Here, the municipal defendants cannot be held liable because no constitutional violation occurred.")

Under California negligence law, "[l]aw enforcement personnel's tactical conduct and decisions preceding the use of deadly force are relevant considerations . . . in determining whether the use of deadly force gives rise to negligence liability. Such liability can arise, for example, if the tactical conduct and decisions show, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Hayes v. Cty. of San Diego*, 305 P.3d 252, 263 (Cal. 2013). A finding of no Fourth Amendment violation does not necessarily resolve the state negligence claim. "[S]tate negligence law, which considers the totality of the circumstances surrounding any use of deadly force is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used . . . the state and federal standards are not the same[.]" *Id.* at 263 (citations omitted).

Both parties have submitted the reports of use-of-force experts. Plaintiffs' expert, Scott A. DeFoe, opines that Defendants made tactical errors and exhibited a lack of situational awareness before and at the time of the shooting. (DeFoe Rpt., ECF No. 37-10 at 11–15). Defendants submit the report of Jeffrey A. Martin. Martin concludes that Defendants followed standard police practices and acted reasonably. (Martin Rpt., ECF No. 30-2 at 180). To grant summary judgment to Defendants, this Court would have to conclude that, viewing the facts most favorably to the plaintiff, no reasonable juror could find negligence under California state law. *See Hayes*, 305 P.3d at 258.

Having resolved all federal claims in this matter, this Court declines to exercise its supplemental jurisdiction over the remaining state battery and negligence claims. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.") (footnotes omitted).

//

//

## V.    Conclusion

IT IS HEREBY ORDERED that the Motion for Summary Judgment filed by Defendants Peter Myers, Christopher Villanueva, and County of San Diego (ECF No. 30) is GRANTED.  Defendants are entitled to summary judgment on all federal claims.  The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state battery and negligence claims.  Plaintiffs' state claims are dismissed without prejudice.

The Clerk of the Court shall enter judgment in favor of Defendants on all federal claims, dismiss Plaintiffs' state claims without prejudice, and close the case.

Dated:  May 20, 2019

Hon. William Q. Hayes
United States District Court

17-cv-1459-WQH-AGS